UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 1:12-cr-115 |
| v. | ) | |
| | ) | *Mattice / Lee* |
| IZAAC COFFELT | ) | |

**REPORT AND RECOMMENDATION**

Before the Court is the motion to suppress filed by Defendant Izaac Coffelt ("Defendant") seeking to exclude evidence seized during: (1) a warrantless search of his residence on August 31, 2011; and (2) a traffic stop on August 27, 2012 [Doc. 53].[1] After careful consideration of the evidence and arguments, I find no constitutional violation occurred with respect to either incident, and I **RECOMMEND** that Defendant's motion to suppress be **DENIED**.

**I.     EVIDENCE**

As it relates to evidence seized from Defendant's residence in 2011, the Indictment charges Defendant with a conspiracy to manufacture and distribute methamphetamine, a conspiracy to possess and distribute pseudoephedrine, and possession of items used to produce methamphetamine. As it relates to evidence seized from Defendant's car in 2012, the Indictment charges Defendant with being a felon in possession of a firearm.

At the hearing, the government offered the testimony of Sergeant Tim Prince ("Prince"), Deputy Charlie Rittenberry ("Rittenberry"), and Detective Matt Blansett ("Blansett"), all with the

---

[1] The motion was referred for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) [Doc. 55]. The government filed a response in opposition to the motion [Doc. 68]. An evidentiary hearing was held on the motion on March 14, 2013. While initially Defendant indicated a need to receive additional discovery, by the time of the hearing all discovery had been provided or determined to be unavailable (as addressed herein a portion of the recording of the traffic stop was lost or destroyed). At the request of Defendant, post-hearing briefs were allowed, and each party's post-hearing brief [Doc. 72 & 73] has been fully considered.

Marion County Sheriff's Department, and Tennessee State Trooper Terrence Gann ("Gann"). Defendant presented no witnesses and the relevant material facts do not appear to be in dispute. Based on the officers' collective credible testimony, the following constitutes my findings of fact.

### A. Warrantless Search of House Facts

On August 30, 2011 around 10:00 p.m., Prince, Rittenberry, and other officers from the Marion County Sheriff's Department and the Jasper Police Department received a dispatch from a Marion County 911 dispatch operator who reported that a domestic violence incident was in progress at a residence located at 11232 Highway 41 in Guild, Tennessee. The dispatch operator reported receipt of a 911 call from the victim's mother who reported her daughter was being beaten and held against her will at the residence by a male with a gun. Neither Prince nor Rittenberry, who responded separately to the dispatch along with at least two other officers, could remember if either the male or female involved in the domestic dispute was identified by name in the dispatch.[2]

The officers proceeded directly to Defendant's residence upon dispatch because of the nature of the 911 call. Rittenberry arrived in the area of the residence shortly after the dispatch; however, he had difficulty finding the exact location of the residence, a single-wide trailer, because there were few markers and one driveway led to multiple trailers. Prince arrived around the same time the officers located the correct trailer.

Upon arrival at the front door of Defendant's trailer some 15 to 20 minutes after the dispatch, the officers announced their presence and knocked, but nobody inside the trailer responded. As the officers walked around the trailer, they could not hear any noise from within the trailer. The

---

[2] They testified they understood Yolanda King was the domestic violence victim. Neither officer was previously aware of Defendant at the time of the dispatch. Apparently Ms. King also stayed at the residence and she is one of the co-defendants named in the Indictment.

2

windows were covered and the officers could not see through most of the window covering. However, through a crack in the covering on one of the windows located on the right side of the trailer, Prince and Rittenberry could see the lit kitchen area. They observed kitchen items scattered about in disarray and an overturned chair. Believing an armed domestic altercation had just taken place based on the dispatch and their observations of the kitchen area, Prince and Rittenberry made a forced entry into the locked trailer to determine whether anyone in the residence was in immediate danger or required medical assistance. The forced entry was made about five minutes after their arrival at the correct trailer and the protective sweep of the trailer was completed within one to two minutes.

During the protective sweep, the officers smelled a distinctive methamphetamine odor and saw in plain view items which were consistent with the operation of a methamphetamine lab. The officers did not find anyone inside, so they exited the trailer without moving or seizing anything. The officers remained outside the trailer and Prince contacted Blansett to advise Blansett about the suspected methamphetamine lab. Blansett had previously heard of Defendant's name in connection with methamphetamine manufacturing.

Blansett arrived at Defendant's residence about 20 minutes later and spoke to the officers about what they had seen inside the trailer. In the meantime, Defendant was located in a different area and brought to the trailer in a patrol car. As Defendant sat in the backseat of the patrol car, Blansett asked Defendant for consent to search the trailer. After Defendant denied consent to search, Blansett left the residence to prepare an application for a search warrant.

Around midnight, Blansett obtained a warrant to search the residence based on the reported

observations of Prince and Rittenberry during the protective sweep.[3] No law enforcement officer entered the residence between the conclusion of the protective sweep and the execution of the search warrant, which was executed in the wee morning hours of August 31, 2011. During execution of the warrant, officers seized several items consistent with the manufacture of methamphetamine. These seized items were destroyed, without laboratory analysis, by the methamphetamine task force.

### B. Traffic Stop Facts

About a year later, in a completely separate incident on August 27, 2012 around 10:20 p.m., Gann was on routine patrol driving in the right-hand lane some distance behind Defendant's vehicle on Highway 72, which is a four lane highway with two lanes running in each direction and a concrete divider down the middle of the road. After about a half mile of travel, Gann observed Defendant's car cross over the "fog line," which is the far right lane marker, but the car did not go into the shoulder of the road. Gann continued to drive behind Defendant's car and about a "couple hundred feet" later, Defendant crossed over the fog line again, but this time he went about three feet into the shoulder of the road where he narrowly missed a large sign warning of construction ahead. The vehicle swerved back onto the highway to avoid contact with the sign.

There were no external conditions that may have caused the swerve such as bad weather or obstacles in the road. Gann activated his blue lights to initiate a traffic stop based on the observed violation of Tenn. Code Ann. § 55-8-123 (failure to maintain lane). Defendant promptly and properly pulled over. The facts of what occurred during the stop are not at issue.

The activation of Gann's blue lights also activated his patrol car recording equipment. The

---

[3] At the hearing, a copy of the search warrant was entered as Exhibit A; Blansett's affidavit in support of the search warrant was entered as Exhibit B; and the search warrant return was entered as Exhibit C.

4

equipment captures a 30 second time period prior to the activation of the blue lights. Gann reviewed the recording of the stop later that night in his patrol car and the recording did capture the second fog line crossing. He "marked" the recording for future use in connection with his arrest of Defendant that night on the charge of driving under the influence.[4]

The patrol car equipment records in 50 minute "segments" on a disk that holds about 14 hours of recorded segments. The entire stop lasted about three hours, and was captured on three recorded segments on the patrol car disk. On a weekly basis, the disk is downloaded to a server. When Gann sought a copy of the recording for Defendant's case, he was told the first two 50 minute recorded segments of the stop were "lost" when the server "went down" in October of 2012.[5] Gann asked "IT" to try to find the "lost" recorded segments but was told by IT that the missing segments could not be accessed because of the "change" in servers. Gann testified that only he, his sergeant, and perhaps people who worked in IT would have had access to the recorded segments on the server.

## II. ANALYSIS

The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. Const. amend. IV. Defendant claims two violations of the Fourth Amendment: an illegal warrantless search of his residence during the protective sweep (prior to obtaining the search warrant) and an

---

[4] The citation of Defendant for failure to maintain lane is government's Exhibit D; the implied consent form is Defendant's Exhibit 1, and Defendant's arrest records for driving under the influence are included in government's collective exhibit E. During a search of the vehicle, a loaded firearm and ammunition were found in the car along with drug-related items.

[5] Only the final segment in the stop remains available and it was not viewed during the hearing or entered into evidence, as both sides appear to agree it has no bearing on the issues presented herein.

5

illegal traffic stop.[6] Both claims fail for the reasons set forth below.

        **A.**        **Warrantless Search of Residence**

Defendant contended that the initial warrantless entry into, and search of, his residence violated his Fourth Amendment right to be free from unreasonable searches and that, as a result, all evidence seized during the subsequent execution of the search warrant was "fruit of the poisonous tree" and must be suppressed. The government responded that the warrantless entry and search were proper due to exigent circumstances; namely, the need to perform a protective sweep to determine if anyone present in the residence was in immediate danger or required medical assistance. Defendant replied that the government did not prove the existence of exigent circumstances.

The Fourth Amendment protects against a warrantless entry into and search of a residence by police absent a few specifically established exceptions. *See, e.g., United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974); *Payton v. New York*, 445 U.S. 573, 584-86 (1980); *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993). One such exception whereby a warrantless search of a home may be reasonable under the Fourth Amendment is the existence of exigent circumstances. *See United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994) (exigent circumstances create limited exception to warrant requirement). The government must prove by a preponderance of the evidence the exception of exigent circumstances to justify a warrantless search. *See Matlock*, 415 U.S. at 177 n.14 (1974); *United States v. Lewis*, 231 F.3d 238, 241 (6th Cir. 2000).

Generally, four exigent circumstances may justify a warrantless search of a residence: (1)

---

[6] Defendant has the burden of establishing a legitimate expectation of privacy to assert a Fourth Amendment right. *See United States v Smith*, 263 F.3d 571, 581-82 (6th Cir. 2001) (the term "standing" is used "somewhat imprecisely to refer to this threshold substantive determination") (citation omitted). The parties are in agreement that Defendant has "standing" to raise both alleged Fourth Amendment violations.

hot pursuit of a fleeing felon; (2) imminent destruction of evidence; (3) prevention of a suspect's escape; and (4) risk of danger to the police or others. *Johnson*, 22 F.3d at 680. The government claims the exigent circumstances of "risk of danger" justify the warrantless entry and protective sweep in this case.

The Fourth Amendment does not bar the police from entering a residence and conducting a limited search, in other words a protective sweep, when the police reasonably believe a person within the residence is in need of immediate aid or protection. *See Mincey v. Arizona*, 437 U.S. 385, 392 (1978); *Michigan v. Fisher*, 130 S. Ct. 546, 548 (2009). Under this exception, "[t]he police's entry must be based on an objectively reasonable belief, given the information available at the time of entry, that a person within the house was in need of immediate aid." *Johnson v. City of Memphis*, 617 F.3d 864, 868 (6th Cir. 2010) (internal quotation marks and citations to *Mincey* and *Fisher* omitted).

Thus, the dispositive question is whether it was objectively reasonable for the officers to believe a person within the trailer was at immediate risk of harm or in need of immediate aid based on (1) the 911 dispatch advising them that a mother called 911 to report that her daughter was beaten and was being held against her will in the trailer by an armed male and (2) their observations of disarray, including an overturned chair, in the kitchen. I **FIND**, under the totality of the circumstances, the answer is "yes." *See Johnson*, 617 F.3d at 869-70 ("The district court was correct in finding that the police were justified in entering the home to sweep for a person in need of immediate assistance under the emergency aid exception. The whole point of the 911 system is to provide people in need of emergency assistance an expeditious way to request it. . . . The officers' actions – announcing their presence and, after receiving no answer, entering in order to perform a

7

cursory search for any endangered or injured persons – was an objectively reasonable response.") That no victim was found, or even that the 911 call may ultimately "prove[] to be false or inaccurate, does not render the police action any less lawful[,]" *United States v. Holloway*, 290 F.3d 1331, 1340 (11th Cir. 2002), because the police may enter a dwelling to protect a resident from domestic violence as long as they have good reason to believe a domestic violence threat exists, *Georgia v. Randolph*, 547 U.S. 103, 118 (2006).

Defendant argues exigent circumstances were lacking because the officers heard no noise coming from inside the residence during the approximately five minutes they investigated around the outside of the trailer and because the observed disarray in the kitchen was minor and did not include blood and broken items. Such arguments do not seriously call into question the officers' objectively reasonable belief that a person within the trailer was at immediate risk of harm or in need of immediate aid. The officers were aware of a 911 call from an identified third party indicating her daughter was beaten and was being held against her will by an armed male. Several officers from at least two law enforcement agencies responded by immediately going to the scene to quickly and safely investigate the call for help. Silence could reasonably be expected if a victim was being held at gunpoint or was injured inside the trailer and, therefore, would not dispel a reasonable belief that a person within was in need of immediate aid or protection. The officers' attempts to gather additional information from the outside of the trailer for no longer than five minutes does not suggest a lack of emergency response by the officers; instead, it indicates a need for caution when dealing with an armed domestic violence threat. The officers could only see into one small area of the trailer, but in that area they saw disarray, including an overturned chair, which they reasonably concluded was an indicator of domestic violence. That there was no blood observed, that the

8

disorder in the kitchen was not greater, or even that there may have been other explanations for the disorder does not render the officers' belief in the existence of exigent circumstances objectively unreasonable.

True, the exclusionary rule prohibits the government from using the fruits of an unlawful search or seizure as evidence in its criminal case-in-chief, *see New York v. Harris*, 495 U.S. 14, 19 (1990), in order to deter unlawful government behavior, *United States v. Gross*, 662 F.3d 393, 401 (6th Cir. 2011). Use of the exclusionary rule, however, assumes an underlying illegal search or seizure. Here, there was none because, as noted above, the officers did not improperly enter and search the residence because exigent circumstances existed.

Defendant's remaining search warrant argument – that if the officers had not improperly entered the residence, they would not have seen in plain view (or perhaps smelled) the information subsequently used to obtain the warrant – is precluded by my finding that the entry and sweep did not violate Defendant's Fourth Amendment rights. Likewise, it is not necessary to address the government's alternative "*Leon*" or good faith argument concerning the search warrant.

Accordingly, I **CONCLUDE** Defendant's motion to suppress evidence seized from his residence fails.

### B. Traffic Stop

Defendant also argues Gann lacked probable cause to stop his vehicle for a traffic violation and that all evidence seized as a result must be suppressed. The government argues Gann had probable cause to make the traffic stop based on his observation of a violation of Tenn. Code Ann. § 55-8-123 (failure to maintain lane). After the hearing, Defendant added an argument that the loss of two recorded segments of the video of the stop amounts to a due process violation and is proof

9

Defendant did not commit a lane violation.

Within the meaning of the Fourth Amendment, an ordinary traffic stop is considered an investigative detention governed by principles established in *Terry v. Ohio*, 392 U.S. 1 (1968). *See United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999). Under *Terry*, and as relevant here, this Court must determine whether the stop was "justified at its inception." *Terry*, 392 U.S. at 19-20. "An officer may stop and detain a motorist so long as the officer has probable cause to believe that the motorist has violated a traffic law." *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009); *see also United States v. Hughes*, 606 F.3d 311, 316 (6th Cir. 2010) (citing *United States v. Blair*, 524 F.3d 740, 746 (6th Cir. 2008)); *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012).[7]

"Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007) (quoting *Henry v. United States*, 361 U.S. 98, 102 (1959)). Probable cause deals with *probabilities*; it does not require evidence sufficient to establish a prima facie case that a particular law has been violated. *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006). In the context

---

[7] The United States Court of Appeals for the Sixth Circuit "has developed two separate tests to determine the constitutional validity of vehicle stops: an officer must have probable cause to make a stop for a civil infraction, and reasonable suspicion of an ongoing crime to make a stop for a criminal violation." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008); *see also United States v. Simpson*, 520 F.3d 531, 541 (6th Cir. 2008) (if the police suspect an ongoing violation of the law, regardless of whether the violation was criminal or civil in nature, then the stop's constitutionality "is governed by the standard of reasonable suspicion, not probable cause."). In the instant matter, the government first argues the police had probable cause to stop the vehicle for a traffic infraction and, as a result, the more demanding probable cause standard is applied herein. Alternatively, the government argues Gann had reasonable suspicion to stop Defendant for driving under the influence. It is not necessary to address this alternative argument, however, given my finding of probable cause for the stop based on Gann's observation of Defendant's violation of Tenn. Code Ann. § 55-8-123 and Gann's testimony that he stopped the vehicle based on probable cause a failure-to-maintain-lane violation occurred. Given my findings, it is also unnecessary to address the government's other alternative argument that a good faith exception applies even if Gann reasonably, but mistakenly, believed a traffic violation was committed.

10

of determining probable cause to support a search warrant, the Sixth Circuit recently explained anew:

> The Supreme Court has recently reaffirmed that the test for probable cause is not reducible to "'precise definition or quantification.'" *Florida v. Harris*, __ S. Ct. __, 2013 WL 598440, slip op. at 5 (Feb. 19, 2013) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). And that "'[f]inely tuned standards . . . have no place in the [probable-cause] decision.'" *Id.* (quoting *Gates*, 462 U.S. at 235). Accordingly, the Court has "consistently looked to the totality of the circumstances" to determine "whether the State has met this practical and common-sensical standard," and has "rejected rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach." *Id.*

*United States v. Kinison*, __F. 3d __, 2013 WL 1104640, at *3 (6th Cir. Mar. 19, 2013). It is the government's burden to demonstrate the stop was constitutional. *See Florida v. Royer*, 460 U.S. 491, 500 (1983).

Tenn. Code Ann. § 55-8-123 provides, in relevant part: "Whenever any roadway has been divided into two (2) or more clearly marked lanes for traffic, the following rules, in addition to all others consistent with this section, shall apply: [] A vehicle shall be driven as nearly as practicable entirely within a single lane . . . ." I **FIND** ample probable cause to support the stop of Defendant for a violation of Tenn. Code Ann. § 55-8-123 based on Gann's credible testimony of his observations. *See United States v. Little*, No. 97-3200, 1999 WL 196515, at *4 (6th Cir. Mar. 24, 1999) (probable cause exists under Tenn. Code Ann. § 55-8-123 where defendant twice crossed into the road's shoulder); *United States v. Palomino*, 100 F.3d 446, 448 (6th Cir. 1996) (probable cause exists under Tenn. Code Ann. § 55-8-123 where defendant went back and forth between right lane and emergency lane of road); *United States v. Pino*, 855 F.2d 357, 359-61 (6th Cir. 1988) (probable cause exists under Tenn. Code Ann. § 55-8-123 where defendant swerved onto shoulder, almost

11

hitting the guardrail). This conclusion is supported by Defendant's arrest for driving under the influence and his failure to present any evidence to dispute Gann's version of events.

Accordingly, I **CONCLUDE** Defendant's motion to suppress evidence because the stop was not supported by probable cause fails.

### C. Due Process

Citing primarily to *California v. Trombetta*, 467 U.S. 479 (1984) and *Arizona v. Youngblood*, 488 U.S. 51 (1988), Defendant appears to take the position that evidence of the gun located in Defendant's car should be suppressed because his due process rights were violated by the police or government's failure to produce the missing segments of the recorded traffic stop. While not entirely clear, Defendant appears to assert the first recorded segment could have been used to attempt to impeach Gann's testimony about Defendant's failure to maintain lane.[8] In other words, Defendant contends the missing recorded segment would have allowed Defendant to more fully litigate his motion to suppress, presumably by discrediting Gann's testimony.

"Under the Due Process Clause, the Supreme Court has developed 'what might loosely be called the area of constitutionally guaranteed access to evidence.' " *United States v. Jobson*, 102 F.3d 214, 218 (6th Cir. 1996) (quoting *Trombetta*, 467 U.S. at 485). A due process violation arises from the destruction or loss of evidence when the evidence "possess[es] an exculpatory value that

---

[8] The government mistakenly argues it is not clear from Gann's testimony that the missing evidence would have captured the circumstances leading up to the traffic stop assuming the video camera was operable [Doc. 73 at Page ID# 186]. To the contrary, Gann testified he viewed the recording the night of the stop and the recording captured Defendant's second failure to maintain lane violation which is when Defendant narrowly missed the construction sign. While the Court could ask for more briefing to address the issue of what remedy would appropriately apply *if* Defendant's due process rights were violated as a result of the destruction or loss of the recording, it is not necessary to engage in that effort given my conclusion that Defendant has not met his burden to prove his due process rights were violated.

12

was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489. A higher standard of proof applies, however, when the evidence is only *potentially* useful to a defendant because, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Youngblood*, 488 U.S. at 58; *see also United States v. Branch*, 537 F.3d 582, 589-90 (6th Cir. 2008) (no bad faith where officer consciously failed to preserve defective dash board recording of traffic stop). "Negligence, even gross negligence, on the part of the government does not constitute bad faith." *Branch*, 537 F.3d at 590. A defendant claiming a violation of due process bears the burden of proof. *Trombetta*, 467 U.S. at 488; *Jobson*, 102 F.3d at 218.

Defendant essentially argues the police failed to preserve the entire recording because it would have demonstrated Defendant did not actually commit a traffic violation. True, if the recording showed Defendant did not cross the fog line and narrowly miss a construction sign it would have discredited Gann's testimony, especially since Gann testified he viewed the recording that night and it did show the violation. However, there is no evidence to suggest the missing recording would actually dispute Gann's testimony of the stop. As argued by the government, even Defendant did not dispute Gann's testimony about Defendant's traffic violation. Simply stated, I **FIND** nothing about the cross examination of Gann called into question his veracity and no evidence was presented to suggest Gann was less than fully credible about probable cause for the traffic stop. At most, Gann's testimony showed he was not particularly knowledgeable about the IT department or the reason why the missing recorded segments could not be located.

I conclude the missing recorded segments of the stop are not material *exculpatory* evidence

13

as defined in *Trombetta* because the exculpatory nature of the recordings was not apparent before their loss or destruction. *Trombetta*, 467 U.S. at 488-89. Indeed, Gann's uncontradicted and fully credible testimony is that the recorded segments were inculpatory and, for that reason, Gann took steps, albeit unsuccessful, to preserve the recorded segments. *See United States v. Parker*, 72 F.3d 1444, 1452 (10th Cir. 1995) ("[T]he only way the erased video tape evidence could be 'apparently' exculpatory is if it demonstrated that the events did not occur as [the trooper] related, that is, that he was lying about the events . . . . Whether [the trooper] was telling the truth was essentially a question of credibility for the district court.").

Turning to whether the missing evidence qualifies as "potentially useful" under *Youngblood*, Defendant has not shown bad faith on the part of the police. The testimony reflects only that Gann was told by someone in IT that IT could not locate the missing segments due to a change in servers. At most, this testimony indicates the loss or destruction of the recorded segments was inadvertent or negligent. I **FIND** Defendant has failed to demonstrate a violation of due process as he has not made the required showing that the missing recording was clearly exculpatory or that the police acted in bad faith.

Accordingly, I **CONCLUDE** Defendant's motion to suppress evidence resulting from the traffic stop based on a due process violation fails.

14

## III. CONCLUSION

Accordingly, I **RECOMMEND**[9] that Defendant's motion to suppress [Doc. 53] be **DENIED**.

                                        s/ *Susan K. Lee*
                                        SUSAN K. LEE
                                        UNITED STATES MAGISTRATE JUDGE

---

[9] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b)(2) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).